

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
07/12/2021

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 21-30574** |
| **COUNTRY FRESH HOLDING COMPANY** | § | |
| **INC.,** *et al,* | § | |
| Debtors. | § | **Jointly Administered** |
| | § | **CHAPTER 7** |

## <u>MEMORANDUM OPINION</u>

Country Fresh Holding Company, Inc. seeks authority to implement a Key Employee Incentive Program (KEIP). Under Country Fresh's KEIP, five key Country Fresh employees will receive bonuses, but only if those employees achieve certain performance-based objectives. To implement its KEIP, Country Fresh had to demonstrate that the KEIP properly incentivizes the five employees as required by 11 U.S.C. § 503(c). Section 503(c) generally prohibits a debtor from making retentive payments to "insiders." Several parties-in-interest, including the United States Trustee and the Official Committee of Unsecured Creditors, argue that Country Fresh's proposed KEIP is a retention-based payment program prohibited by § 503(c)(1).

Although Country Fresh's proposed KEIP incentivizes the key employees, portions of the KEIP's compensation structure are not justified by the facts and circumstances of Country Fresh's bankruptcy. Country Fresh's KEIP Motion is granted in part and denied in part.

This Memorandum Opinion is issued after the close of Country Fresh's asset sale. However, the KEIP's merits must be evaluated as of the date of the KEIP's proposal, and this opinion assesses its "incentives" prospectively.

## BACKGROUND

One month following its entry into chapter 11, Country Fresh proposed a "Key Employee Incentive Program." Country Fresh's proposed KEIP is aimed at five key Country Fresh

employees.  Under the KEIP, these five employees will be awarded bonuses if Country Fresh achieves certain objectives.  The parties opposing County Fresh's proposed KEIP[1] take issue with these objectives, arguing that the objectives are too easy to achieve.

### Country Fresh's Bankruptcy

Country Fresh and its affiliate debtors entered bankruptcy in February 2021.[2]  (ECF No. 1).  Like many commercial debtors over the last year, the COVID-19 pandemic thrust Country Fresh into dire financial straits.  (ECF No. 18 at 3).  When it entered chapter 11, Country Fresh had already determined that its best path through bankruptcy would be a sale of substantially all of its United States and Canadian assets.  (ECF No. 18 at 4).

Roughly one month before filing for chapter 11 relief, Country Fresh received a letter of intent from Stellex Capital Management.  (ECF No. 18 at 5–6).  Stellex proposed to purchase substantially all of Country Fresh's U.S. and Canadian assets for $30 million in cash plus a secured note with a $25 million face value.[3]  (ECF No. 18 at 16–17).  At the time it entered bankruptcy, Country Fresh "believe[d] this to be the best price attainable in the market for [its] assets."  (ECF No. 18 at 17).[4]

---

[1]  The United States Trustee, the Official Committee of Unsecured Creditors, as well as a number of PACA Creditors objected to Country Fresh's KEIP (collectively, the "Objecting Parties").  (*See* ECF Nos. 324, 376, 388, 390, 397).

[2] First Day hearings in Country Fresh's case were conducted under extraordinary circumstances, as much of Texas was without reliable electricity.  *See* Neelam Bohra, *Almost 70% of ERCOT customers lost power during winter storm, study finds*, Tex. Tribune (Mar. 29, 2021, 5:00 AM), https://www.texastribune.org/2021/03/29/texas-power-outage-ERCOT/.

[3] Country Fresh intended to discount the note by roughly 9% ($2.3 million) resulting in an actual note value of approximately $22.7 million.  (*See* ECF No. 428-5 at 1).  Hence, the actual Stalking Horse Bid was $52.7 million.  (*See* ECF No. 428-5 at 1).

[4]  Because it entered bankruptcy with a probable purchaser, Country Fresh sought approval of bidding procedures to protect Stellex as the "Stalking Horse Bidder," including the payment of a $1.45 million "breakup fee."  (ECF Nos. 18 at 17–18; 539 at 13, 19).

In connection with its asset sale, Country Fresh held an auction to ensure it obtained the best possible price for its assets.  (*See* ECF No. 164).  The auction resulted in a gross bid of $68 million for substantially all of Country Fresh's assets.  (Mar. 31, 2021 Hearing at 10:00:00 AM, 11:53:32 AM).  After deductions, the net sale price of Country Fresh's assets was approximately $13.2 million over the Stalking Horse bid.[5]  (*See* Mar. 31, 2021 Hearing at 10:00:00 AM, 11:53:35 AM, 11:53:51 AM).

Country Fresh completed its asset sale process on April 29, 2021.  (ECF No. 548 at 1).

### Country Fresh's KEIP

Between the petition date and the sale's completion, Country Fresh moved for approval of its KEIP.  (*See* ECF No. 275).  The KEIP's focus is on five members of Country Fresh's management team: (1) William Andersen, President and CEO; (2) Art Innis, CFO; (3) Jay McMillan, Executive Vice President of Operations; (4) German Suarez, Executive Vice President of Food Safety; and (5) Debra Lawson, Executive Vice President Human Resources (collectively, the "KEIP Participants").[6]  (ECF No. 275 at 4).  The KEIP Participants are "responsible for the overall strategy and direction of [Country Fresh's] business."  (ECF No. 275 at 4).  Country Fresh contends that, in addition to their usual job responsibilities, the KEIP Participants devoted significant time to preparing Country Fresh for chapter 11 and "laying the foundation for the sale process."  (ECF No. 275 at 4–5).  Country Fresh maintains that the KEIP Participants continued to shoulder these additional responsibilities postpetition.  (ECF No. 275 at 5).  Because the KEIP Participants are "integral" to Country Fresh's reorganization process, Country Fresh's position is

---

[5] The actual increase, based on Country Fresh's exhibits, was $13.15 million.  (ECF No. 428-5 at 1). Deducted from the sale price were the breakup fee of $1.45 million and reimbursable expenses of $700,000.  (ECF No. 539 at 13, 19).  After these deductions, the net sale price was $65.85 million—or $13.15 million higher than the original $52.7 million Stalking Horse Bid.  (*See* Mar. 31, 2021 Hearing at 10:00:00 AM, 11:53:35 AM, 11:53:51 AM).

[6] Country Fresh acknowledges that each KEIP Participant is an "insider" as defined by 11 U.S.C. § 101(31) (2020).

that it is imperative to incentivize the KEIP Participants to work toward a successful reorganization.  (ECF No. 275 at 5, 13).

To incentivize the KEIP Participants, Country Fresh proposes to award bonuses based on two objectives: a fill-rate objective and a sale price objective.  (ECF No. 275 at 5).  First, the KEIP Participants will be awarded bonuses amounting to 25% of their base salaries if Country Fresh maintains a post-petition aggregate "fill rate"[7] of 95.5% until the closing of its asset sale.  (ECF No. 275 at 5).  Country Fresh justifies using fill rate as a KEIP objective because it is a "challenging benchmark that will benefit [Country Fresh]" and its reorganization efforts.  (ECF No. 275 at 7–8).  Second, the KEIP Participants will also receive incrementally increasing bonuses based on the eventual sale price of Country Fresh's assets.  (ECF No. 275 at 8).  Specifically, the KEIP Participants will receive $123,550 in aggregate bonuses for every $1 million received above the "Stalking Horse Bid."  (ECF No. 275 at 8).  Initially, Country Fresh's KEIP imposed a cap on the sale-based bonus each KEIP Participant, except Mr. Andersen, could receive.  (ECF No. 275 at 8–9).

The Objecting Parties take issue with both targets.[8]  The Objecting Parties argue that Country Fresh cannot demonstrate that the fill-rate target adequately incentivizes the KEIP Participants.  (*See* ECF Nos. 376 at 6; 388 at 7–8).  While the Objecting Parties concede that Country Fresh can use historical data to establish the difficulty of achieving the fill-rate target, they point out that sufficient data is absent from the record.  (ECF Nos. 376 at 6; 388 at 8).

---

[7] "A 'fill rate' represents the percentage of times that a distributor can fill a customer's order on a timely basis.  For example, if a distributor ships nine of ten items a customer orders, then the fill rate for that particular customer is 90%."  *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 12-2760-DDC-KGS, 2016 WL 1377342, at *3 (D. Kan. Apr. 7, 2016).

[8] The PACA Creditors also oppose the KEIP as being contrary to the payment-priority scheme imposed by the Perishable Agricultural Commodities Act.  (*See* ECF Nos. 324, 397).  Because provision has been made for their claims to be paid in full, the PACA Creditors' priority argument (erroneous when made) is now moot.

The Objecting Parties also argue that the sale price target fails to adequately incentivize the KEIP Participants. (ECF Nos. 376 at 7–8; 388 at 8). Driving the Objecting Parties' opposition to the sale price incentive is the fact that Country Fresh's asset sale was almost complete at the time Country Fresh proposed the KEIP. (ECF Nos. 376 at 8; 388 at 8). The Objecting Parties also contend that the KEIP Participants' efforts will have little effect on a "bidder['s] own business judgment" in valuing Country Fresh's assets. (ECF No. 376 at 7). According to the Objecting Parties, Country Fresh's Chief Restructuring Officer, not the KEIP Participants, is primarily responsible for the increased sale price. (ECF No. 376 at 7).

Based on their conclusion that the KEIP targets fail to properly incentivize the KEIP Participants, the Objecting Parties maintain that the KEIP is a disguised retention plan. (*See* ECF Nos. 376 at 8–9; 388 at 8).

### *The KEIP Hearing*

Following the parties' briefing, the Court set Country Fresh's KEIP Motion for an evidentiary hearing. Country Fresh called two witnesses in support of its proposed KEIP, Michael Krakovsky, Country Fresh's investment banker, and Stephen Marotta, Country Fresh's Chief Restructuring Officer. (*See* ECF No. 444).

Mr. Krakovsky's testimony detailed Country Fresh's sale process and Mr. Andersen's contributions to that process. (Mar. 31, 2021 Hearing at 10:50:00–11:17:00 AM). According to Mr. Krakovsky, Mr. Andersen's efforts generated more interest in Country Fresh's assets than existed at the time the Stalking Horse Bid was made. (*See* Mar. 31, 2021 Hearing at 10:57:20 AM). Mr. Krakovsky also noted that Mr. Andersen's efforts led to substantially increased bids for Country Fresh's assets. (*See* Mar. 31, 2021 Hearing at 11:01:00 AM). The Objecting Parties do

not dispute Mr. Krakovsky's characterizations of Mr. Andersen's efforts and the role Mr. Andersen played in Country Fresh's sale process.

Mr. Marotta, the KEIP's self-proclaimed designer, provided insight into the KEIP's creation, the rationale underlying its targets, and the compensation associated with the KEIP targets. (*See* Mar. 31, 2021 Hearing at 11:18:50 AM–12:00:00 PM). Mr. Marotta began by laying out the rationale behind using fill rates as a performance target. According to Mr. Marotta, Country Fresh's ability to maintain high fill rates directly affects its ability to operate as a going concern. (*See* Mar. 31, 2021 Hearing at 11:19:20 AM). Moreover, in the immediate aftermath of its bankruptcy filing, Country Fresh's fill rate fell due to skittish suppliers and carriers. (*See* Mar. 31, 2021 Hearing at 11:19:20–11:28:45 AM). Mr. Marotta described the work the KEIP Participants needed to perform to return Country Fresh's fill rates to their pre-petition levels, noting the post-petition responsibilities of each KEIP Participant. (*See* Mar. 31, 2021 Hearing at 11:28:45–11:37:45 AM). Based on his judgment and past fill-rate data from Country Fresh, Mr. Marotta determined that a 95.5% fill rate would be a challenging mark to achieve. (*See* Mar. 31, 2021 Hearing at 11:22:00 AM, 11:24:30 AM, 11:43:10 AM).

Mr. Marotta's testimony regarding Country Fresh's sale mirrored Mr. Krakovsky's. That is, Mr. Marotta confirmed that Mr. Andersen played a vital role in generating interest in substantially all of Country Fresh's assets. (*See* Mar. 31, 2021 Hearing at 11:19:20 AM). Mr. Marotta also credited the increased sale price to Mr. Andersen's pre- and post-petition marketing efforts. (*See* Mar. 31, 2021 Hearing at 11:38:00 AM, 11:46:00 AM). Though it was Mr. Andersen's efforts that primarily led to the increased sale price, Mr. Marotta explained that the other KEIP Participants were also necessary to Country Fresh's marketing and sale process. (*See* Mar. 31, 2021 Hearing at 11:39:15 AM). Because of their necessity to the sale process, Mr.

Marotta determined that the other Participants should be eligible for sale-based bonuses. (*See* Mar. 31, 2021 Hearing at 11:39:15 AM).

On cross-examination, the Objecting Parties challenged Mr. Marotta's decisions to use a 95.5% fill-rate target, to use a price-based target, and to allow Mr. Andersen to receive an uncapped, sale-based bonus. The Committee's counsel primarily attacked Mr. Marotta's chosen fill-rate target, attempting to establish that a 95.5% fill-rate would be too easy to achieve. (*See* Mar. 31, 2021 Hearing at 3:17:00–3:26:30 PM). Counsel for the U.S. Trustee focused on the sale price target. In response to the U.S. Trustee's questions about the propriety of the $1 million sale price benchmark, Mr. Marotta conceded that the $1 million benchmark was "arbitrary." (Mar. 31, 2021 Hearing at 3:53:40 PM). The Court and the U.S. Trustee's counsel also pressed Mr. Marotta for an explanation as to why Mr. Andersen was excluded from the KEIP's sale-based bonus cap. (*See* Mar. 31, 2021 Hearing at 4:07:00 PM, 4:12:00 PM, 4:33:30 PM). At one point, Mr. Marotta said that Mr. Andersen and Country Fresh's Board of Directors decided to leave Mr. Andersen's sale-based bonus uncapped. (Mar. 31, 2021 Hearing at 4:08:40–4:11:00 PM). Minutes later, however, Mr. Marotta testified that he alone determined that Mr. Andersen's bonus should be left uncapped. (Mar. 31, 2021 Hearing at 4:12:40–4:13:40 PM). Mr. Marotta's responses to these questions led the Court to question Mr. Marotta's credibility on this issue, and to conclude that Mr. Andersen likely influenced the decision to leave his potential bonus uncapped. (*See* Mar. 31, 2021 Hearing at 4:33:30 PM).

At the hearing's conclusion, the Court expressed concerns regarding the methods used to calculate Country Fresh's fill-rate, as well as concerns about Mr. Andersen's uncapped bonus potential. (*See* Mar. 31, 2021 Hearing at 4:33:30 PM). To address these concerns, Country Fresh was invited to file additional support for its KEIP. (*See* Mar. 31, 2021 Hearing at 4:33:30 PM).

The Court also afforded the parties an opportunity to present closing arguments. Country Fresh's closing stressed that the Objecting Parties did not challenge Mr. Marotta's qualifications or the efficacy of the KEIP's targets.[9] (*See* Apr. 12, 2021 Hearing at 11:29:45 AM). The Objecting Parties focused their closings on: (1) the lack of evidence establishing the difficulty of achieving the KEIP targets; (2) the lack of detail underlying the fill-rate target's formulation; (3) Mr. Marotta's decision to leave Mr. Andersen's bonus uncapped; and (4) the relative size of the KEIP payout compared to the increase in the sale price. (*See* Apr. 12, 2021 Hearing at 11:34:30 AM, 11:50:20 AM, 11:52:00 AM, 11:52:50 AM).

### *Post-Hearing Filings*

Following the hearings, Country Fresh filed a "Revised KEIP Proposal." (*See* ECF No. 614-1).[10] In its revised proposal, Country Fresh provided detailed calculations of the KEIP bonus each KEIP Participant stood to receive upon the KEIP's approval (assuming its objectives were achieved), as well as the data used to calculate Country Fresh's post-petition fill rate. (ECF No. 614-1 at 2–3). Notably, under this revised KEIP, Mr. Andersen's sale-based bonus was capped at $600,000. (ECF No. 614-1 at 2). The Committee responded to Country Fresh's revised KEIP, asserting that the revised proposal still lacked sufficient detail. (ECF No. 627 at 3–4).

The Court then took the matter under advisement.[11]

---

[9] That is, the Objecting Parties did not dispute that the KEIP Participants were, in fact, incentivized by the KEIP's benefits. (*See* Apr. 12, 2021 Hearing at 11:29:45 AM, 11:42:00 AM).

[10] Prior to this revised proposal, Country Fresh filed two other revised KEIP proposals. (*See* ECF Nos. 466; 515).

[11] Following closing arguments, the Court ordered Country Fresh to hold, in escrow, the full amount of the KEIP ($1,502,500) in cash derived from the sale proceeds. (ECF No. 521 at 2).

## JURISDICTION

The Court's jurisdiction over this proceeding arises under 28 U.S.C. § 1334. The allowance or disallowance of administrative expenses is a core matter under 28 U.S.C. § 157(b)(2)(A), (B). This case was referred to the bankruptcy court under 28 U.S.C. § 157(a). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

Country Fresh proposed a KEIP to reward five high-level employees with bonuses for achieving certain performance goals during Country Fresh's reorganization process. The Objecting Parties maintain that the KEIP is a retention plan that rewards the five employees simply for remaining with Country Fresh postpetition. Consistent with 11 U.S.C. § 503(c), Country Fresh may implement a compensation plan that incentivizes its high-level employees, but the plan's primary objective cannot be to ensure those employees' retention.

Country Fresh's proposed KEIP incentivizes the KEIP Participants, but the KEIP's compensation structure is not tailored to the facts and circumstances of this case. Country Fresh's KEIP is approved with the modifications set out below.

Business debtors, like Country Fresh, rely on incentive plans (or KEIPs) to encourage their managers and high-level employees (*i.e.,* "insiders"[12]) "to produce and increase the value of Debtors' estate." *In re Global Home Prods., LLC*, 369 B.R. 778, 787 (Bankr. D. Del. 2007). A KEIP usually offers a debtor's insiders bonuses for achieving performance-based objectives. *See, e.g., In re Mesa Air Grp., Inc.*, 10-10018 (MG), 2010 WL 3810899, at *3–4 (Bankr. S.D.N.Y. Sept. 24, 2010) (describing an incentive plan that paid a debtor's key employees bonuses, the size of which depended on the amount of profit generated by the debtor). Achieving these

---

[12] *See* 11 U.S.C. § 101(31) (defining "insider" as used in the Bankruptcy Code).

performance-based objectives (thereby, triggering a KEIP bonus) generally requires insiders to exceed their *usual* job responsibilities.  *In re Dana Corp.*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006) ("*Dana II*") (approving an insider compensation plan that "properly incentivize[d]" insiders to increase the value of the estate by taking on additional job responsibilities).  Hence, KEIPs entice a bankrupt company's leaders to go above and beyond what is normally expected of them in order to maximize the value of the estate and ensure a successful reorganization.  *In re Borders Grp., Inc.*, 453 B.R. 459, 472 (Bankr. S.D.N.Y. 2011) ("The KEIP also encourages the Executives to increase their pre-bankruptcy job responsibilities to achieve the bonus requirements.").

Different from KEIPs, key employee retention plans (KERPs) are aimed at inducing a debtor's employees to remain in the debtor's employ during bankruptcy—"pay to stay" plans.  *In re Dana Corp.*, 351 B.R. 96, 98 (Bankr. S.D.N.Y. 2006) ("*Dana I*").  KERPs are subject to the limitations imposed by 11 U.S.C. § 503(c)(1).  *See In re Residential Cap., LLC*, 478 B.R. 154, 169 (Bankr. S.D.N.Y. 2012) ("[I]f a debtor proposes to (i) make a transfer or incur an obligation; (ii) to or for the benefit of an insider of a debtor; (iii) for the purpose of retaining that insider, it must meet the strict requirements of section 503(c)(1).").  Generally, § 503(c)(1) bars debtors from implementing KERPs for the benefit of insiders.  11 U.S.C. § 503(c)(1);[13] *Residential Cap.*, 478 B.R. at 169.

## I.    COUNTRY FRESH'S KEIP INCENTIVIZES THE KEIP PARTICIPANTS

Country Fresh characterizes its proposed KEIP as "incentive-based."  The Objecting Parties argue that Country Fresh's characterization is *only* that—a characterization.  According to

---

[13] Section 503(c)(1) does authorize retention payments to insiders if an insider has a "bone fide job offer from another business."  11 U.S.C. § 503(c)(1)(A)–(C).

the Objecting Parties, the KEIP's retentive purpose is obvious from the easily achievable benchmarks the KEIP Participants must reach to trigger the KEIP's bonuses.

Compensation plans that genuinely incentivize insiders require those insiders to "increase their pre-bankruptcy job responsibilities." *Borders Grp.*, 453 B.R. at 472.  Insiders are encouraged to take on additional responsibilities by a promise of bonuses once the KEIP's performance targets are met. *In re Velo Holdings Inc.*, 472 B.R. 201, 210 (Bankr. S.D.N.Y. 2012).  To ensure that insiders are truly incentivized, the KEIP's performance targets should not be "lay-ups." *Id.* at 211 (citing *Dana II*, 358 B.R. at 583).  Bonuses tied to easily achievable performance goals are generally viewed as retentive, "pay to stay" bonuses, which are inconsistent with § 503(c)'s requirements. *Glob. Home*, 369 B.R. at 783–84, 786–87 (quoting Karen Lee Turner & Ronald S. Gellert, *Dana Hits a Roadblock: Why Post–BAPCPA Laws May Impose Stricter KERP Standards,* 3 No. 14 ANDREWS BANKR. LITIG. REP. 2, 2 (2006)) ("[Section 503(c) was intended] to eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process . . . ." (internal quotation marks omitted)).  Country Fresh bore the burden of demonstrating that its KEIP's performance targets genuinely incentivized the KEIP Participants. *Residential Cap.*, 478 B.R. at 170.

Compensation plans that genuinely incentivize insiders are removed from the strictures of § 503(c)(1). *Dana II*, 358 B.R. at 584 ("By presenting an executive compensation package that properly incentivizes the CEO and Senior Executives . . . the Debtors have established that section 503(c)(1) does not apply.").  Rather, incentive plans are governed by § 503(c)(3), which authorizes debtors to make payments outside their ordinary course of business if the payments are "justified by the facts and circumstances of the case." *See Dana II*, 358 B.R. at 576 ("If sections 503(c)(1) and (c)(2) are not operative, a court may consider whether the payments are permissible under

section 503(c)(3) . . . . [S]ection 503(c)(3) gives the court discretion as to bonus and incentive plans, which are not primarily motivated by retention or in the nature of severance."). Country Fresh maintains its proposed KEIP should be analyzed under § 503(c)(3).

### A.    The Fill-Rate Target

Country Fresh proposes to use a fill-rate triggered bonus to incentivize the KEIP Participants to maximize the estate's value. The Objecting Parties argue, generally, that the fill-rate target is easily achievable and arbitrarily calculated. The KEIP's fill-rate target will genuinely incentivize the KEIP Participants.

Country Fresh supported its choice to link the KEIP bonuses to a fill-rate target by pointing to the decline in fill rates after Country Fresh entered chapter 11. Country Fresh's aggregate fill rate for the seven weeks preceding its bankruptcy was 95.51%. (ECF No. 614-1 at 3). The fill rate for the first week following the petition date was 93.80%. (ECF No. 614-1 at 3). Essentially, the KEIP required the KEIP Participants to return Country Fresh's fill rates to their pre-petition levels within the trying confines of chapter 11.

Mr. Marotta's testimony established the difficulties the KEIP Participants faced in upholding Country Fresh's supply obligations. No party challenged this testimony or attempted to offer contradictory evidence demonstrating the ease of this task. While the Participants may have faced difficulties, the dispositive question is whether achieving a 95.5% post-petition fill rate was "bound to occur." *See In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) (finding that a KEIP target was not genuinely incentivizing because it was "bound to occur").

The evidence presented demonstrates that the fill-rate target is difficult to achieve and, therefore, incentivizing. *See Velo Holdings*, 472 B.R. at 211 (explaining that KEIP targets that are

difficult to achieve "properly incentivize" a debtor's key employees).  First, the precipitous decline in Country Fresh's fill rate from its pre-petition level demonstrates that, when not prioritized, fill rates fall.  *Cf. Hawker Beechcraft*, 479 B.R. at 313; *Residential Cap.*, 478 B.R. at 172 ("[T]he only thing that KEIP Participants have to do for their Awards to vest is remain with the Debtors' businesses until the Closing of two Asset Sales that were substantially negotiated pre-petition.").  Mr. Marotta expressed that a decline in fill rates could negatively impact Country Fresh's ability to successfully market and sell its assets—Country Fresh's reorganization end-goal.

Country Fresh presented undisputed evidence that a failure to exceed a 95.5% fill rate could result in contractual penalties and customer cancellations.  (*See* Mar. 31, 2021 Hearing at 11:19:20 AM, 4:35:00 PM).  Based on the undisputed evidence, meeting the fill-rate target is both essential to the success of Country Fresh's enterprise and difficult to consistently maintain.

Second, while bankruptcy provides to debtors a "breathing spell" from the pressures imposed by creditors, it also subjects debtors to the strictures of judicial supervision.  Operating a logistically intense business, like Country Fresh, requires constant coordination with suppliers and carriers.  Often, this coordination requires management to be flexible in negotiating the terms on which suppliers and carriers are engaged.  Flexibility in negotiating terms is not, necessarily, a luxury associated with bankruptcy.  Yet, as Mr. Marotta's uncontested testimony highlighted, the KEIP Participants had to overcome the inflexibility imposed by Country Fresh's bankruptcy in attempting to achieve the fill-rate target and operate Country Fresh as a going concern.  Achieving the fill-rate target challenged the KEIP Participants "to do more than meet the [KEIP's] wide-scale goals."  *Borders Grp.*, 453 B.R. at 472.  It required them to "address concerns and issues unique to bankruptcy."  *Id.*

Country Fresh demonstrated, by a preponderance of the evidence, that the KEIP's fill-rate target and associated bonuses properly incentivize the KEIP Participants. *See Residential Cap.*, 478 B.R. at 170 ("[T]he Debtors must establish by a preponderance of the evidence that the KEIP is primarily incentivizing and not primarily retentive.").

However, it is unclear whether the KEIP Participants hit their fill-rate target. In their post-hearing filing, Country Fresh represents its aggregate fill rate for the eight weeks following the petition date as 95.79%. (ECF No. 614-1 at 3). Country Fresh's data also shows that the aggregate fill rates for the two weeks preceding the sale's closing were 92.65% and 92.72% respectively. (ECF No. 614-1 at 3). The fill-rate data provided ends on April 25, 2021, but Country Fresh's U.S. asset sale closed on April 29, 2021—four days later. (*Compare* ECF Nos. 614-1 at 3 *with* 548 at 1). Given how close the aggregate post-petition fill rate was to the target fill rate, without those four days of data it is unclear whether the KEIP Participants are entitled to fill-rate bonuses.

Nevertheless, determining fill-rate compliance is now the Chapter 7 Trustee's fiduciary duty. The Court approves the fill-rate target and charges the Trustee with determining whether Country Fresh achieved the target.

### B.  Sale-Based Target

The second component of Country Fresh's KEIP is a sale-based incentive. Under the KEIP's terms, the KEIP Participants will receive incrementally larger bonuses for each $1 million increase in the sale price over the Stalking Horse Bid. Because Country Fresh has now capped Mr. Andersen's KEIP bonus potential, the Objecting Parties remaining objections are to whether the sale price target genuinely incentivizes the KEIP Participants and to the arbitrariness of the $1

million target increments.[14]   The KEIP's sale price target genuinely incentivizes the KEIP Participants.

Country Fresh's decision to include a sale incentive in its KEIP is not unique.  *See, e.g.*, *Borders Grp.*, 453 B.R. at 465 (noting the inclusion of an asset-sale-based KEIP incentive); *Velo Holdings*, 472 B.R. at 207 (evaluating a KEIP proposal with asset-sale-based incentives); *Residential Cap.*, 478 B.R. at 163 ("The Debtors want to motivate the KEIP Participants to ensure that 'the Debtors can effectively work toward their collective goal of effectuating the Asset Sales.'").  However, the bare goal of an asset sale does not adequately incentivize a debtor's insiders.  *Hawker Beechcraft*, 479 B.R. 308, 313–14 (disapproving a KEIP because its sale-based incentives were not "much of a challenge" and because it paid bonuses for simply "consummating a plan that [was] likely to occur").  That is, a KEIP bonus is not truly incentivizing if it vests merely because KEIP employees remain with the debtor through an asset sale's closing.  *Residential Cap.*, 478 B.R. at 172.  Rather, the KEIP bonus must be tied to a challenging objective.  *See Borders Grp.*, 453 B.R. at 472–73 (approving a KEIP that paid bonuses based on how quickly the debtor consummated an asset sale).

It is undisputed that Country Fresh intended for the KEIP's sale price incentive to increase the value of the estate.  The Objecting Parties take issue with whether the KEIP Participants faced a challenge in securing a purchase price above the Stalking Horse Bid.  If the KEIP Participants were able to sit back and watch potential purchasers outbid each other, driving the price above the Stalking Horse Bid, then they were not truly incentivized by the sale target.  *See Residential Cap.*,

---

[14] Initially, Country Fresh's KEIP guaranteed Mr. Andersen a $100,000 bonus upon the asset sale's closing. (ECF No. 275 at 8).  While the sale's realities obviated the effect of this guarantee, it is worth noting that KEIP awards that vest because a KEIP Participant remains with the debtor through the close of an asset sale do not properly incentivize employees.  *Residential Cap.*, 478 B.R. at 171–73.

478 B.R. at 171–72 (disapproving a KEIP's sale-based incentive because it was not tied to the results of the debtor's asset auction).

It is this type of free riding that the Objecting Parties argue occurred. According to the Objecting Parties, Mr. Andersen and the other KEIP Participants knew, before the KEIP was finalized, that the ultimate sale price would exceed the Stalking Horse Bid. (*See* Mar. 31, 2021 Hearing at 11:11:15 AM; *see also* ECF Nos. 375 at 7; 388 at 8). To demonstrate that the sale target incentivizes the KEIP Participants (and that the KEIP Participants were not free riding their way to bonuses), the Objecting Parties urge that Country Fresh needed to adduce evidence showing the "likelihood of higher bids." (ECF No. 388 at 8). This proposed standard is without authoritative support. Instead, Country Fresh was required to establish that the KEIP Participants would be incentivized by the sale target, which would in turn led the KEIP Participants to increase the estate's value. *See Dana II*, 358 B.R. at 584.

The Objecting Parties concerns regarding the KEIP's timing are belied by the uncontested evidence that the KEIP Participants knew a KEIP was in the works before the petition date. (*See* Mar. 31, 2021 Hearing at 11:40:00 AM). Also uncontested is Mr. Marotta's assurance that Country Fresh delayed in seeking approval of the KEIP because Country Fresh faced more pressing concerns early in its bankruptcy. (*See* Mar. 31, 2021 Hearing at 11:41:00 AM). This evidence demonstrates that, before Country Fresh received increased bids for its assets, the KEIP Participants knew their bonuses depended on their continued commitment to operating Country Fresh as a going concern, not just on remaining with Country Fresh.

However, the KEIP Participants' pre-auction knowledge of the KEIP's goals does not alone establish that the KEIP's sale-based target was genuinely incentivizing. Whether a KEIP target genuinely incentivizes insiders is also a function of the demands the KEIP imposes on its

participants, *see Velo Holdings*, 472 B.R. at 211 (requiring a KEIP to incentivize insiders to perform "at the highest level"); *Borders Grp.*, 453 B.R. at 472 (noting that KEIPs should "encourag[e] [insiders] to increase their pre-bankruptcy job responsibilities"), as well as the direct effect the participants have on the estate's value, *see Velo Holdings*, 472 B.R. at 211 ("The KEIP's goals are also consistent with the policies underlying chapter 11. . . . [A] sale of a debtor's business as a going concern under section 363 also achieves the chapter 11 goal of preserving businesses and maximizing recoveries for creditors.").  Moreover, a KEIP must only award those participants that "contribute[d] services [necessary] to achieve the [KEIP's] targets." *Hawker Beechcraft*, 479 B.R. at 313.

## 1.    The Sale-Based Target's Effect on Mr. Andersen

Even before Country Fresh received increased bids, the KEIP's sale price target was aimed at encouraging Mr. Andersen to actively market Country Fresh's assets.  These marketing efforts were, surely, outside Mr. Andersen's pre-bankruptcy responsibilities. *Cf. Borders Grp.*, 453 B.R. at 472 (noting that bankruptcy allowed KEIP participants to cancel contracts, something the participants were not expected to do outside bankruptcy).  And the magnitude of the KEIP's sale-based financial incentive is directly related to the success of Mr. Andersen's marketing efforts (*i.e.*, the increase in sale price). *Cf. Velo Holdings*, 472 B.R. at 211.  Country Fresh also offered evidence of Mr. Andersen's, as the CEO, significant role in increasing the ultimate sale price. *See Hawker Beechcraft*, 479 B.R. at 313 (requiring a debtor to identify the role KEIP participants played in achieving a successful asset sale).  The KEIP's sale-based target incentivizes Mr. Andersen.

2.      *The Sale-Based Target's Effect on the other KEIP Participants*

The sale-based target's incentivizing effect on the other four KEIP Participants is less clear. Mr. Marotta detailed the other Participants' contributions to Country Fresh's post-petition operations and justified including the Participants in the sale incentive based on their commitment to Country Fresh's continued operation.  Yet Mr. Marotta also explained that the sale-based target was aimed at "incentiviz[ing]" the other Participants to "continue to support [the sale] process," (Mar. 31, 2021 Hearing at 11:46:00 AM), and conceded that Mr. Andersen played the "most significant" role in the marketing process,  (Mar 31, 2021 Hearing at 11:47:00 AM).  Moreover, Mr. Andersen generated interest in Country Fresh's assets by assuring interested parties that the other KEIP Participants would remain with Country Fresh until the asset sale's closing.  (*See* Mar. 31, 2021 Hearing at 11:47:40).  This justification raises concerns.

Mr. Marotta explained that the vitality of Country Fresh's marketing process depended on the other KEIP Participants remaining with Country Fresh.  That is, Country Fresh needed to incentivize the other Participants to stay with Country Fresh to ensure a successful marketing process.  While incentive plans are almost always somewhat retentive, a KEIP's primary aim must be to incentivize insiders to exceed their usual job responsibilities.  *See Glob. Hom*, 369 B.R. at 786–77; *see also Hawker Beechcraft*, 479 B.R. at 313 ("The Court must examine a proposed KEIP . . . [to] determine whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work.").  This fundamental requirement in assessing KEIPs under § 503(c) is why a KEIP's proponent must "identify the roles each [KEIP participant], individually or as part of a team, [will play in] contribut[ing] services that are necessary to achieve the [KEIP] targets." *Hawker Beechcraft*, 479 B.R. at 313.  Based on Mr. Marotta's characterization, the other

KEIP Participants' roles in Country Fresh's marketing and sale process were—simply—to keep reporting to work.

However, like maintaining pre-petition file rates, bankruptcy made challenging what was once routine. Despite Mr. Marotta's frail description of the other KEIP Participants' roles in the sale, the overall evidence stressed that their efforts were necessary to maintaining Country Fresh's perceived value—an important objective in an asset auction. *Cf. Borders Gr.*, 453 B.R. at 472 (approving a sale-based KEIP incentive that "require[d] enormous commitments by management" (internal quotation marks omitted)). Those efforts necessarily required the other KEIP Participants to remain with Country Fresh through its asset sale. Yet the evidence demonstrates that working as a Country Fresh insider postpetition demanded more than simply reporting to work. The Objecting Parties offer little to controvert these purported demands, or the effect meeting these demands would have on the sale process. Moreover, the Objecting Parties cannot argue that the KEIP's goals are inconsistent with the policies underlying chapter 11. Securing a bid above the Stalking Horse Bid is the epitome of "maximizing recoveries for creditors." *See Velo Holdings*, 472 B.R. at 211 (citing *Bank of Am. Nat'l Tr. & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)).

The Court assesses the KEIP's incentives prospectively. As the sale developed, Mr. Andersen emerged as the key individual influencing the ultimate sale price. But this eventuality was not assured when Country Fresh first proposed the KEIP. Aside from their roles in maintaining Country Fresh's stability, the other Participants *could have* been called on to assist with the marketing process at any time. The sale price target was aimed at incentivizing the other Participants to be prepared to do what was necessary to ensure a successful sale.

Were Country Fresh's burden to demonstrate, beyond a reasonable doubt, that the KEIP's sales target incentivized every KEIP Participant, a different conclusion might prove appropriate. Here, however, Country Fresh established that it is more likely than not that the sales target incentivizes the KEIP Participants.  *See Residential Cap.*, 478 B.R. at 170.

## II.   THE FACTS AND CIRCUMSTANCES UNDERLYING COUNTRY FRESH'S KEIP

Because Country Fresh's KEIP properly incentivizes the KEIP Participants, its approval depends not on § 503(c)(1).  Instead, § 503(c)(3) controls.  *Borders Grp.*, 453 B.R. at 473.  Section 503(c)(3) requires "transfers or obligations that are outside the ordinary course of [the debtor's] business" to be "justified by the facts and circumstances of the case . . . ."  11 U.S.C. § 503(c)(3).

### A.   Applicable Standard Under 11 U.S.C. § 503(c)(3)

Courts disagree over the meaning of "justified by the facts and circumstances of the case."[15] *Compare Borders Grp.*, 453 B.R. at 473–74 (citing *Dana II*, 358 B.R. at 576) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b).") *with In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236 (Bankr. N.D. Tex. 2009) ("[T]he test of section 503(c)(3) should not be equated to the business judgment rule as applied under section 363(b)(1).").  Similarly, the Objecting Parties urge one meaning while Country Fresh suggests its KEIP satisfies § 503(c)(3) regardless of which standard applies.  (*Compare* ECF No. 275 at 14–15 *with* ECF No. 388 at 8–9).

---

[15] Section 503(c)(3) provides:

> (c) Notwithstanding subsection (b), there shall neither be allowed, nor paid—
>
> > (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3).

One interpretation of § 503(c)(3)'s "facts and circumstances" language equates it to the business judgment test employed by § 363(b).[16] *Borders Grp.*, 453 B.R. at 473–74. The other interpretation adopts a standard similar to the business judgment test, but with an additional demand to ensure that the debtor's actions serve the interests of creditors and the estate. *See Pilgrim's Pride*, 401 B.R. at 237 ("[T]he court must make its own determination that the transaction will serve the interests of creditors and the debtor's estate.").

In *Dana II*, the Bankruptcy Court for the Southern District of New York concluded that § 503(c)(3) requires an analysis no different than § 363's business judgment analysis. 358 B.R. at 576–77 (citing *In re Nobex Corp.*, 05-20050 (MFW), 2006 WL 4063024, at *2–4 (Bankr. D. Del. Jan. 19, 2006)). The *Dana II* court adopted this approach to § 503(c)(3) with little reasoning, instead relying on bare conclusions of law from a Delaware bankruptcy decision—*In re Nobex Corp.*, 2006 WL 4063024. *Dana II*, 358 at 576–77. Like the Southern District in *Dana II*, the *Nobex* court failed to adequately explain its interpretation of § 503(c)(3)'s facts-and-circumstances language as demanding an application of the business judgment standard required under § 363. 2006 WL 4063024, at *3 ("3. The sale-related incentive pay to [insiders] satisfies the requirements of section 363 of the Bankruptcy Code. . . 5. The sale-related incentive pay to [insiders] is not prohibited by section 503(c)(3) of the Bankruptcy Code.").

The Bankruptcy Court for the Northern District of Texas in *Pilgrim's Pride* came to a different conclusion about § 503(c)(3)'s language. 401 B.R. at 236–37. There, the Northern District found that "[§] 503(c)(3) should not be equated to the business judgment rules as applied under [§] 363(b)(1)." *Id.* This conclusion was based on the presumption that Congress intends to engraft different meanings on independent sections of the Code. *Id.* at 237 (citing *BFP v. Resol.*

---

[16] Section 363(b)(1) provides: "(b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).

*Tr. Corp.*, 511 U.S. 531, 537 (1994)).  Essentially, because §§ 363(b)(1) and 503(c)(3) are different sections, they must impose different standards.[17]  Given § 503(c)(3)'s language, the *Pilgrim's Pride* court adopted an interpretation of § 503(c)(3) requiring judges to find that the KEIP represents more than just a good business decision, but that it also serves the interests of creditors and the debtor's estate.  *Id.*

Neither interpretation necessarily binds this Court's review.  Instead, the meaning of § 503(c)(3)'s plain terms must prevail.  *In re Camp*, 631 F.3d 757, 759 (5th Cir. 2011) (quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)).  Notably, neither § 363(b), nor § 503(c)(3) contain the words "business judgment."  *See* 11 U.S.C. §§ 363(b), 503(c)(3).

The application of a business judgment standard in analyzing a debtor-in-possession's use of § 363(b) sprang out of the Second Circuit's opinion in *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d. Cir. 1983).  In holding that an asset sale under § 363(b) must be based on "some articulated business justification," the Second Circuit relied on the history of § 363(b)(1)'s enactment and the "logic underlying" that enactment.  *Id.* at 1070.  Shortly after *Lionel*, the Fifth Circuit adopted its interpretation of § 363(b).  *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) (citing *Lionel*, 722 F.2d at 1071).  The Fifth Circuit clarified that the debtor's "business justification" for a § 363(b) sale must account for the debtor-in-possession's fiduciary obligation to the debtor entity, its creditors, and the estate.  *Id.*  Hence, the "business justification['s]" sufficiency will depend on the specific case in which it is offered.  *Id.*  Because the sufficiency of the debtor-in-possession's business justification is case-dependent, courts "should consider all

---

[17] Specifically, *any* transaction outside the debtor's ordinary course of business is subject to the busines judgment requirements of § 363(b).  *Pilgrim's Pride*, 401 B.R. at 236–37.  However, transfers outside the ordinary course *made for the benefit of the debtor's insiders* are subject to § 503(c)(3).  *Id.*  Had Congress intended to subject transfers to insiders outside the ordinary course to § 363(b)'s requirements, it could have stayed silent.  *Id.*  Yet Congress included § 503(c)(3) and explicitly subjected transfers encompassed by § 503(c)(3) to a facts-and-circumstances analysis.  *Id.*

salient factors . . . , [and] act to further the diverse interests of the debtors, creditors, and equity holders."  *Id.* (quoting *Lionel*, 722 F.2d at 1071) (internal quotation marks omitted).  In sum, § 363(b) requires the debtor-in-possession to articulate a case-specific business justification for the sale that considers the sale's effect on the debtor, the estate, and the debtor's creditors.

Given the case-specific nature of the business judgment analysis demanded by § 363(b), it is easy to see why courts equate § 503(c)(3)'s requirements with the business judgment standard from § 363(b).  Nevertheless, as the *Pilgrim's Pride* court recognized, the fact remains that § 503(c)(3)'s words are different than those of § 363(b).  *Compare* 11 U.S.C. § 363(b) *with* § 503(c)(3).  Importantly, § 503(c)(3) expressly requires a facts-and-circumstances analysis, while § 363(b) does not.  *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *see also City of Chi., Ill. v. Fulton*, 141 S. Ct. 585, 591–92 (2020) (rejecting an argument that one section of the Code implicitly operates by function of another section of the Code).

Section 503(c)(3)'s language makes clear that courts must consider all relevant facts and circumstances surrounding a proposed KEIP.  *See Camp*, 631 F.3d at 759 (quoting *Laime*, 540 U.S. at 534) ("When the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." (internal quotation marks and brackets omitted)).  In some instances, the relevant facts and circumstances may overlap with the business judgment factors articulated in *Dana II*, 358 B.R. at 576–77; *see also In re FirstEnergy Sols. Corp.*, 591 B.R. 688, 697 (Bankr. N.D. Ohio 2018) ("These factors are neither exhaustive nor of inherently equal weight.").[18]  But it

---

[18] The *Dana II* court provided the following factors courts should consider under the "business judgment" test:

would be inappropriate to engraft a standard onto § 503(c)(3) not found in § 503(c)(3)'s text, and which is potentially more restrictive than the facts-and-circumstances analysis § 503(c)(3)'s language demands. The most faithful reading of § 503(c)(3) is one requiring more "than simple deference to the debtor's business judgment." *See* 4 COLLIER ON BANKRUPTCY ¶ 503.17 (16th ed. 2021); *see also Pilgrim's Pride*, 401 B.R. at 236–37 ("A transfer made or an obligation incurred outside the ordinary course of a debtor's business would fall within section 363(b)(1) in the absence of section 503(c)(3), and, thus, the latter provision would add nothing to the Code.").

### B.      Country Fresh's KEIP's Compliance with § 503(c)(3)

Section 503(c)(3)'s language required Country Fresh to demonstrate that its KEIP is "justified by the facts and circumstances" of this case. 11 U.S.C. § 503(c)(3). In assessing the KEIP, the Court must ensure that the KEIP's implementation will "serve the interests of creditors and the debtor's estate." *Pilgrim's Pride*, 401 B.R. at 237.

---

– Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

– Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

– Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

– Is the plan or proposal consistent with industry standards?

– What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

– Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

358 B.R. at 576–77.

### 1.     *Country Fresh's Business Judgment*

Country Fresh entered bankruptcy knowing its fate would be the sale of substantially all of its assets.  And Country Fresh knew its assets would be sold for at least the amount of the Stalking Horse Bid.  Nevertheless, Country Fresh, primarily through its CEO Mr. Andersen, continued to market its assets, attempting to increase the sale price above the Stalking Horse Bid.  Because the marketing process did not end on the petition date, Country Fresh determined it needed to remain profitable and maintain its pre-petition operating performance.  (ECF No. 275 at 16).

Given its post-petition objectives, Country Fresh determined that a fill-rate incentive would support Country Fresh's efforts to maintain post-petition profitability and operating performance. Country Fresh also determined that a sale-based incentive would encourage the management team to work towards maintaining the perceived value of Country Fresh and aiding Mr. Andersen's marketing efforts.    Incentivizing  management  to  maintain  Country  Fresh's  pre-petition performance to support Country Fresh's marketing efforts is a legitimate reason to implement a KEIP.  *See Pilgrim's Pride*, 401 B.R. at 237–38 (considering whether a KEIP was implemented for a "valid business reason"); *see also Velo Holdings*, 472 B.R. at 213 (finding, under the "business judgment" standard, that using a KEIP to improve an asset sale's outcome is sound business judgment).

### 2.     *Interests of Country Fresh's Creditors and its Estate*

However, Country Fresh's good business judgment does not alone justify the KEIP.  Also relevant to whether Country Fresh's KEIP is "justified by the facts and circumstances of" Country Fresh's bankruptcy are: (1) the KEIP's reasonableness in relation to the benefits conferred on creditors and the estate, *see Pilgrim's Pride*, 401 B.R. at 238 ("While the payments to [insiders] will be substantial . . . the cost of the [incentives] is miniscule in comparison [to] the extent of

Debtors' business and the harm that might be done to Debtors' reorganization prospects and estates if the [incentives are not approved] . . . ."); (2) in this case specifically, the disparity in compensation among the KEIP Participants, *see Dana II*, 358 B.R. at 577 (considering, under the business judgment standard, whether a KEIP's scope was "fair and reasonable" and whether "it discriminate[d] unfairly"); and (3) the propriety of Country Fresh's KEIP development process, *see Pilgrim's Pride*, 401 B.R. at 238, 238 n.16 (considering a debtor's use of an independent advisor in formulating a KEIP).

In total, Country Fresh proposes to pay $1,502,500 in KEIP bonuses to the five KEIP Participants—approximately 3% of the Stalking Horse Bid.  (ECF No. 614-1 at 2); *see also In re Aralez Pharm. US Inc.*, 18-12425 (MG), 2018 WL 6060356, at *6 (Bankr. S.D.N.Y. Nov. 19, 2018) (approving a sale-based KEIP with a potential payout of 1.69% of a stalking horse bid). Roughly $1 million of this amount will be paid on account of sale-based bonuses.  (ECF No. 614-1 at 2).[19]  The KEIP Participants will also receive $445,000 in aggregate bonuses for achieving the fill-rate target.  (ECF No. 614-1 at 2).

Generally, the Objecting Parties' oppose the KEIP because they contend the KEIP's targets do not properly incentivize the KEIP Participants.  These objections were addressed above.  Now relevant are the objections: (1) that the KEIP rewards the KEIP Participants for simply doing their jobs; (2) that Mr. Andersen stands to receive the bulk of the KEIP's payout; and (3) that the KEIP's cost is not justified by the facts and circumstances of this case.  For the most part, these objections

---

[19] The Objecting Parties focus on the "arbitrariness" of the $1 million benchmark for incremental increases in sale-based bonuses.  While Country Fresh's decision to use $1 million benchmarks may have been "arbitrary," the Objecting Parties say nothing of how its use contravenes § 503(c)(3)'s requirements.  Moreover, tying incremental bonus increases to increases in the sale price of assets is justifiable.  *See Velo Holdings*, 472 B.R. at 207, 211 (approving a KEIP with sale-based bonuses that grew incrementally larger with incremental increases in sale price).

originate from an erroneous retrospective review of the KEIP.  However, the KEIP's compliance with § 503(c)(3) must be determined prospectively.[20]

The Objecting Parties take issue with rewarding the KEIP Participants for "doing their jobs."  From a retrospective view, this is perhaps a fair criticism.  Three KEIP Participants—Ms. Lawson, Mr. McMillan, and Mr. Suarez—may receive bonuses (fill-rate and sale combined) equivalent to 50% of their annual salaries[21] upon approval of the KEIP.  Yet the retrospective evidence only detailed these Participants' contributions in achieving the fill-rate target.  However, even if these KEIP Participants did no more than what was required to maintain pre-petition fill rates, it is unquestionable that those efforts contributed to Country Fresh's continued operation, which in turn resulted in a successful sale.  Moreover, at the time the KEIP was developed it was unclear whether these Participants would be called upon to facilitate the sale process.  Based on a prospective analysis, Country Fresh justifiably incentivized these three KEIP Participants with bonuses amounting to 50% of their base salaries for contributing to a successful asset sale—even if dependent on two separate performance goals.  *See In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 361–62 (Bankr. E.D. Va. 2016) (approving a KEIP that provided for bonuses between 60% and 175% of the participants' base salaries).  The proof of this is in the retrospective pudding.  Of the five Participants, one (Mr. Andersen) made a substantial contribution retrospectively. Prospectively, however, it was unknown what emergency each KEIP Participant might be required to address.  Yet, in retrospect, the cost of incentivizing the KEIP Participants to stand at the ready was worth it.

---

[20] Whether a KEIP is justified must be determined *prospectively*, otherwise it could not truly incentivize a debtor's insiders.  *See Hawker Beechcraft*, 479 B.R. at 313 ("The Court must examine a proposed KEIP mindful of the practice that Congress sought to eradicate and . . . *determine whether the proposed targets are designed to motivate insiders* to rise to a challenge or merely report to work." (emphasis added)).

[21] References to the KEIP Participants' base salaries are based on Country Fresh's unsealed filings.  (*See* ECF Nos. 275; 428-5; 466; 515; 614-1).

However, Mr. Andersen's and Mr. Innis's potential KEIP payouts are not justified by the facts and circumstances of this case.  Mr. Innis stands to receive a bonus amounting to 90% of his base salary.  Mr. Andersen's potential payout is 143% of his base salary.  While these bonuses are not necessarily unreasonable, *see id.*, the disparity between these amounts and the other KEIP Participants' bonuses must be justified.

Mr. Innis's potential payout raises concerns because the evidence fails to indicate how Mr. Innis's expected role in the sale process differed from those of the other KEIP Participants (excluding Mr. Andersen).  Country Fresh was able to point to specifics about Mr. Andersen's expected role in the sale process and how those specifics justified increasing Mr. Andersen's bonus cap relative to the other Participants.  Yet, at the hearing, Country Fresh only offered evidence about Mr. Innis's role in helping Country Fresh achieve the fill-rate target.  Without evidence justifying Country Fresh's decision to treat Mr. Innis differently than the other Participants, the amount of the sale-based bonus Mr. Innis stands to receive is not justified by facts and circumstances of this case.  *See Dana II*, 358 B.R. at 577 (considering, under the business judgment standard, whether a KEIP's scope was "fair and reasonable" and whether "it discriminate[d] unfairly").  Instead, the evidence justifies offering Mr. Innis the same bonus terms offered to the other KEIP Participants (excluding Mr. Andersen)—a sale price bonus cap of 25% of Mr. Innis's base salary.[22]

Mr. Andersen's maximum potential compensation under the KEIP also exceeds that of the other KEIP Participants.  Of concern is the process by which Country Fresh determined Mr. Andersen's potential KEIP compensation, as well as the disparity between Mr. Andersen's potential compensation and the compensation of the other KEIP Participants.  Based on Mr.

---

[22] In total, Mr. Innis will be eligible to receive a bonus amounting to 50% of his base salary, a fill-rate bonus of 25% of his base salary plus a sale-based bonus capped at 25% of his base salary.

Marotta's testimony, Mr. Andersen influenced Country Fresh's decision to leave Mr. Andersen's potential sale bonus uncapped. (*See* Mar. 31, 2021 Hearing at 4:23:30 PM). In response to the Court's concerns regarding the lack of a cap on Mr. Andersen, Country Fresh capped Mr. Andersen's sale-based KEIP bonus at $600,000—roughly 118% of Mr. Andersen's base salary. However, Country Fresh only capped Mr. Andersen's sale-based bonus after the Court expressed its concern with the lack of a cap, and after the close of the asset auction. (*Compare* ECF No. 466 at 1 *with* ECF No. 278 at 1). At the time the bonus was capped, Country Fresh and Mr. Andersen knew the amount of the sale-based bonus Mr. Andersen would receive.

Country Fresh bore the burden of justifying how Mr. Andersen's KEIP compensation was structured. To carry that burden, Country Fresh called on Mr. Marotta to provide the rationale for leaving Mr. Andersen's sale-based bonus uncapped. Mr. Marotta, however, did not provide a credible explanation for Mr. Andersen's uncapped sale bonus. In fact, Mr. Marotta contradicted himself while trying to explain the lack of a cap—waffling between saying Mr. Andersen influenced the cap decision and that Mr. Andersen did not influence the decision. A situation might conceivably arise in which a debtor's CEO's input on a KEIP's bonus structure will be valuable and lend satisfaction to § 503(c)(3)'s requirements. Here, however, Country Fresh relied on Mr. Marotta alone, and Mr. Marotta could not offer a credible justification for this KEIP's bonus structure.

Without credible evidence regarding the decision to leave Mr. Andersen's KEIP bonus uncapped, Country Fresh could not justify Mr. Andersen's uncapped KEIP bonus. *See Dana II*, 538 B.R. at 577 (noting that both the debtor's diligence efforts and the debtor's receipt of independent counsel are factors in determining whether a KEIP is justified under § 503(c)(3)). Country Fresh had an obligation to act in the best interests of the estate and its creditors. *In re*

*Woerner*, 783 F.3d 266, 271 (5th Cir. 2015) ("[T]he debtor-in-possession . . . takes on the rights, powers, and *fiduciary duties* of a trustee." (emphasis added)); *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) (same); *see also Pilgrim's Pride*, 401 B.R. at 237 ("[T]he court must make its own determination that the transaction *will serve the interests of creditors and the debtor's estate*." (emphasis added)).  Supported by Mr. Marotta's (less than credible) testimony alone, it is not clear that Mr. Andersen's proposed KEIP bonus is in the best interest of the estate and its creditors.  Moreover, to attempt to assuage the Court's concerns about the process underlying Mr. Andersen's potential sale-based bonus, Country Fresh capped Mr. Andersen's potential bonus after it became definite.  In doing so, Country Fresh failed to offer any principled reason for the cap Country Fresh did implement—a cap of 118% of Mr. Andersen's base salary.

Country Fresh unquestionably established that, in developing the KEIP, it recognized that Mr. Andersen was in the best position to influence Country Fresh's assets' sale price.  This was borne out in the auction, which resulted in Country Fresh receiving $13.2 million above the Stalking Horse Bid.  Hindsight cannot, however, dissolve the lack of credibility that tarnishes Country Fresh's prospective evidence supporting its proposed KEIP.

Country Fresh had the burden of establishing that the facts and circumstances of its bankruptcy justified offering Mr. Andersen a sale-based bonus four-and-a-half times greater (as a percentage of base salary) than the bonuses offered to other KEIP Participants.  *See Pilgrim's Pride*, 401 B.R. at 237.  The evidence established that Mr. Andersen was expected to play the most direct role in achieving a successful sale.  But nothing, other than Mr. Marotta's tainted testimony regarding Country Fresh's KEIP development process, justifies offering Mr. Andersen a bonus more than four times larger (as a percentage of base salary) than the bonuses his colleagues stand to receive.  Country Fresh could have justifiably incentivized Mr. Andersen to take the actions

necessary to achieve a successful auction with a sale-based bonus of 50% of his base salary,[23] which amounts to roughly 2% of the increase in sale proceeds.  *See Velo Holdings*, 472 B.R. at 207, 213 (approving a sale-based KEIP bonus that would pay an insider a bonus of either 0.5% or 1% of sale proceeds).  Mr. Andersen's sale-based bonus is capped at 50% of his base salary.

If its targets were achieved, Country Fresh's KEIP presented a substantial upside to creditors.  After adjusting the sale bonus caps, the KEIP's maximum cost to the estate is $1,017,500—roughly 2% of the Stalking Horse Bid.  *See Aralez Pharm.*, 2018 WL 6060356, at *6 (approving a sale-based KEIP with a potential payout of 1.69% of a stalking horse bid).  With these adjustments to Mr. Andersen's and Mr. Innis's potential KEIP bonuses, Country Fresh's proposed KEIP is justified by the facts and circumstances of its bankruptcy case.

## CONCLUSION

Country Fresh's request for approval of its proposed KEIP is granted in part and denied in part.  The KEIP is approved as modified to reflect the appropriate caps on Mr. Andersen's and Mr. Innis's sale-based KEIP compensation.  A separate Order will be issued.

SIGNED 07/12/2021

Marvin Isgur
United States Bankruptcy Judge

---

[23] Mr. Andersen could also receive a bonus of 25% of his base salary for achieving the fill-rate target.  In total, Mr. Andersen is eligible for a bonus amounting to 75% of his base salary, a bonus of almost $400,000 for two and a half months of work.